UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEORGE NORMAN,                    )
                                  )
            Plaintiff,            )
                                  )
        vs.                       )        Case No. 04-CV-645 (CEJ)
                                  )
JO ANNE B. BARNHART,              )
Commissioner of                   )
Social Security,                  )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On November 28, 2000, plaintiff George Norman filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. He also applied for supplemental security income disability benefits under the Act, 42 U.S.C. §§ 1381 et seq. (Tr. 47). Plaintiff's application states that he became unable to work due to his disabling condition on November 14, 2000. He complained of problems with his neck, shoulder, and back, specifically the lower back. (Tr. 36). The applications were denied. (Tr. 36). On July 23, 2001, plaintiff filed another application for a period of disability, disability insurance benefits, and supplemental security income disability benefits under the Act. (Tr. 50). He stated that he was unable to work because of neck, shoulder, and lower back pain. He also stated that he has Hepatitis C. (Tr.

41).  This application was also denied.  (Tr. 41).  On January 27, 2002, an administrative law judge (ALJ) found that plaintiff was not disabled.  (Ex. A).  On March 31, 2003, the Appeals Council of the Social Security Administration remanded the case to the ALJ to offer plaintiff the opportunity for a hearing and to issue a new decision.  (Ex. A).  On January 29, 2004, an ALJ found that plaintiff was not disabled.  (Tr. 13-15, 16-23).  May 4, 2004, the Appeals Council of the Social Security Administration denied plaintiff's request for review of the ALJ's decision.  (Tr. 7).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.  See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

The ALJ received testimony at a hearing on November 20, 2002, and again on November 17, 2003, following remand from the Appeals Council.  (Tr. 281, 300).  Plaintiff testified at both hearings, where he was represented by counsel.

At the November 20, 2002 hearing, plaintiff testified that he was 42 years old and that he had completed the eleventh grade.  (Tr. 284).  In 1985, he earned his GED through a church program in Colorado.  (Tr. 284-85).  Plaintiff gained experience in janitorial service and truck driving during the 15 years preceding the hearing.  He was last employed as a truck driver in 2000.  (Tr. 285).  Plaintiff testified that as a truck driver he mostly drove a tractor trailer over the road.  (Tr. 285-86).  He sometimes loaded the equipment for a company or customer and delivered it to customers.  (Tr. 286).

Plaintiff testified that in 2000 he was involved in a single-vehicle accident while driving his truck. (Tr. 286). He testified that he suffered a "bad sprain, strain to [his] neck and shoulder and lower back." (Tr. 286). His injuries were treated with pain management and therapy, including pain relaxers. Plaintiff also saw a psychiatrist. (Tr. 286). Plaintiff testified that his condition has worsened and that his back hurt constantly. He also stated that his neck and shoulder pain comes and goes along with work. (Tr. 287). He experiences stabbing, sharp pain in his lower back after sitting for about 20 minutes, and the pain sometimes radiates to his left leg. He can stand for about 20 minutes and walk a few blocks before experiencing this pain. (Tr. 287-88). He testified that he takes 600 milligrams of ibuprofen[1] for his pain. (Tr. 288).

Plaintiff testified that on an average he gets up and starts his day between 4:00 a.m. and 6:00 a.m., depending on the pain he feels. (Tr. 288). Sometimes the pain wakes him up, and he lays down until he feels better. (Tr. 288). Plaintiff testified that at night he is only able to sleep for about two or three hours at a time. At most, he gets only four to five hours of sleep each night and he is sometimes fatigued during the day. (Tr. 297). During the 12-hour period between 8:00 a.m. and 8:00 p.m.,

---

[1]Ibuprofen is indicated for relief of headache, muscular aches, minor arthritis pain, toothache, backache, minor aches and pains associated with the common cold, pain of menstrual cramps, and for reduction of fever. See Phys. Desk Ref. 1674 (53d ed. 1999).

plaintiff testified that he lays down for 20-minute periods, totaling an average of five hours each day. (Tr. 289-90). On an average day, plaintiff does some house cleaning. He added that he is sometimes only able to do this work for 20 to 30 minutes at at time. (Tr. 288). Plaintiff does some sweeping and mopping. He has also changed leaky pipes in his basement and replaced tiles on the floors. (Tr. 289). Plaintiff stated that after about 20 minutes of activity, he experiences sharp back pains. To relieve the pain he lays down or takes a muscle relaxer. (Tr. 289).

Since stopping work as a truck driver in 2000, plaintiff has had other jobs. (Tr. 290). He worked as a maintenance helper in the botanical garden, cleaning, landscaping, waxing and stripping floors, carpet cleaning, and setting up for meetings. He worked part-time for about four hours in the evening, five days a week and rotating Saturdays. (Tr. 291). Plaintiff testified that he stopped working at the botanical garden in October 2001 because of pain and the strain on his back, he testified. (Tr. 291). Also in 2001, plaintiff worked, initially part-time and later full-time, as a janitor for cleaning service. (Tr. 291). In this job, he vacuumed carpets, emptied trash cans and sometimes dusted desks in apartment buildings and offices. (Tr. 291). Plaintiff testified that he had to quit this job because he was unable to lift the trash cans, which sometimes weighed 50 pounds, and put it in the Dumpster. (Tr. 292). Plaintiff testified that he did not think he would be able to work as a truck driver or as a janitor on a regular basis, for 40 hours a week, or for a sustained time. (Tr.

298).  He stated that the bending, stooping, lifting, and sitting would cause him pain.  (Tr. 298).

Plaintiff also testified that he did temporary work, catching and stacking bread containers as they came out of a machine.  He also loaded the containers to be shipped out.  (Tr. 292).  He testified that he could only do this work for an hour at a time because he was not able to bend and lift simultaneously.  He described the containers as featherweight.  He added that the problem was not the weight of the objects, but rather the position he had to assume to do the job.  (Tr. 293).  Plaintiff also did temporary work at a warehouse, stacking skids to be shipped out and sweeping the floor.  (Tr. 293).  He was told that he was not working fast enough.  (Tr. 293).  For four days in October 2002, plaintiff worked at a liquor warehouse where he took orders for liquor and placed them on a conveyor belt and loaded trucks. (Tr. 294).

Plaintiff testified that in 1992 he was hospitalized at Malcolm-Bliss Hospital for psychological problems.  (Tr. 295).  He had ingested pills and beer in a suicide attempt.  He was treated a couple of times and then released.  (Tr. 295).  In 2002, Scott Arbaugh, M.D., made a diagnosis of acute depression and prescribed medication.  (Tr. 296).  Plaintiff testified that because of the pain he experiences he often does not want to see other people and is unable to work.  The pain also affects his sexual activity and marital life.  (Tr. 296-97).

At the second hearing on November 17, 2003, plaintiff again testified that he had a lower back injury that caused him to stop working as a truck driver. (Tr. 304). He added that since 2000, he received chiropractic treatment for his back along with massages, acupuncture, creams, and pain medicine. (Tr. 304).

Plaintiff testified that his back pain had remained unchanged since November 2000. (Tr. 305). He testified that he is only able to sit for about 15 minutes before having to turn from side-to-side or stand for comfort. He stated that he can walk for about a block or two before feeling spasms in his back. Plaintiff testified that he can do housework, such as cutting the grass, for about an hour before he begins to experience lower back pain or has to sit down and take a 30-minute break. (Tr. 305).

Plaintiff also testified that his depression had not improved since the first hearing. He testified that he hears voices about twice weekly. He sometimes reads for relief. Every day, the pain and his inability to function cause him to become agitated. (Tr. 306). Plaintiff testified that he had recently gone to the Community Health Partnership (CHIPS) for his depression. (Tr. 307). He was prescribed medication, but he testified that he could not afford to pay for it. (Tr. 308).

After the first hearing, plaintiff made attempts to work. He began working for a company named Tri-Wrench in June 2003. (Tr. 311). There, he rinsed barrels, plastic, and steel. He also lifted and relocated these items. He was terminated, after a month of employment, because the company found his work to be sub-

-6-

standard. (Tr. 309-10). Plaintiff testified that he was holding up the production line, because he could not move fast enough, and he had to take breaks because of pain in his lower back. (Tr. 310). In October 2003, plaintiff worked as a truck driver for Buske Trucking Company. (Tr. 308). During the one-month period he worked there, plaintiff made two trips for the company and was involved in two accidents. (Tr. 309). The first accident occurred when a man ran into plaintiff's truck. Plaintiff was suspended, but he returned after two weeks. (Tr. 311). The second accident occurred when plaintiff was driving around a curve. After that accident, plaintiff was terminated. (Tr. 311). Plaintiff testified that during his employment with Buske he had lower back pain which, at the time, he attributed to fatigue. (Tr. 312).

At the time of the second hearing, plaintiff had been employed by Boyd General Cleaning Company for about a month. He worked for 4½ hours a day, emptying trash cans and dusting. Plaintiff testified that during his shift he takes one 30-minute break and two 15-minute breaks. (Tr. 314). At the time of the hearing, plaintiff had not received any performance evaluations on that job. (Tr. 315).

Plaintiff also worked at the Grace Hill Community Center for two hours in the mornings, delivering food for the Meals-on-Wheels program. (Tr. 315). He is paid $10 per hour, but he has to use his own car. Plaintiff typically delivers 29 meals in two hours. He testified that he experiences back pain when he gets out of the car to make his deliveries. (Tr. 315).

Plaintiff was scheduled to return to CHIPS on November 28, 2003, to see an acupuncturist. He also had an appointment to see a social worker about his depression. (Tr. 316). Plaintiff testified that CHIPS had helped him get pain medicine and muscle relaxers but had not prescribed him any medicine for his depression. (Tr. 317).

### III.  Medical Evidence

Plaintiff receives medical care through HealthSouth Rehabilitation Centers (HealthSouth). On May 26, 2000, plaintiff was seen at HealthSouth for an initial evaluation. (Tr. 169, 220). He complained of pain in his right arm, shoulder and wrist. He also complained of lower back pain. (Tr. 220). The examination revealed that plaintiff "had limited range of motion in the right GH joint with tenderness in the right trapezius, right biceps tendon, and right rhomboid region." Dirt was found under his fingernails, which could indicate that he used the right upper extremity. No gross deviations were found in the lumbar spine, and plaintiff's reflexes were intact. (Tr. 220). The reported date of injury was April 28, 2000. Plaintiff was instructed to go to physical therapy, (Tr. 169), and was prescribed Skelaxin[2] and

---

[2]Skelaxin is a brand of metaxalone. It is indicated to help relieve the discomforts associated with acute, painful musculoskeletal conditions. <u>See</u> <u>Phys. Desk Ref.</u> 875 (53d ed 1999).

Vioxx.[3] (Tr. 220). He had already been taking Motrin.[4] (Tr. 208). In a document signed by C. Douglas Meadows, M.D., it was certified that "skilled rehabilitation services are necessary." (Tr. 169).

On May 31, 2000, plaintiff visited Sue Burton, a physical therapist. (Tr. 171). In a report to Dr. Meadows after the visit, the therapist wrote that plaintiff stated he was involved in an accident in which his truck jackknifed causing his back to be thrown against the trailer. Three days after the accident plaintiff began experiencing pain. The report states, "his chief complaints are intermitted sharp pain in the anterior shoulder with certain activities i.e. lifting carrying items, overhead, and reaching activities across the body, and difficulty with shifting gears in his truck." Plaintiff also complained of lumbar pain that worsened with prolonged sitting or standing. Plaintiff denied any previous shoulder injuries. The therapist noted that plaintiff has a left hip hike and bilaterally internally rotated shoulders. She also noted that he has "good muscle tone throughout his back and shoulders." The therapist noted that plaintiff's left leg is shorter than his right leg due to pelvic asymmetries. Ms. Burton wrote that she would see plaintiff for four visits before his next

---

[3]Vioxx is a brand of rofecoxib. It is an arthritis and acute pain medication. <u>See</u> http://www.vioxx.com.

[4]Motrin is a brand of ibuprofen. Ibuprofen is indicated for relief of headache, muscular aches, minor arthritis pain, toothache, backache, minor aches and pains associated with the common cold, pain of menstrual cramps, and for reduction of fever. <u>See</u> <u>Phys. Desk Ref.</u> 1674 (53d ed. 1999).

doctor's visit with the goals to improve his left shoulder, lumbar, and ability to function without pain. (Tr. 171).

On June 1, 2000, plaintiff went to HealthSouth for physical therapy. He reported feeling okay but stated that his back bothered him. (Tr. 173). On June 2, 2000, plaintiff had physical therapy. He reported feeling a little better, but he reported pain in overhead motions. The physical therapist worked on plaintiff's shoulder and fingers. (Tr. 174). Plaintiff also saw the doctor on June 2, 2000. The doctor's report states that plaintiff is not to drive trucks or lift more than 25 pounds. (Tr. 213). On June 5, 2000, physical therapist Nicole Bennett worked with plaintiff on his lumbar, shoulders, and biceps. She noted that plaintiff's right shoulder rotation had improved. (Tr. 176). On June 8, 2000, plaintiff complained of pain in his lumbar and right shoulder. The therapist who worked with plaintiff noted that "[patient] does not give full effort." (Tr. 179). On June 7, 2000, plaintiff was seen at the Ballas Radiology Group, Inc./Ballas Imaging Center, L.P. for a cervical spine examination. Stanley W. Kim, M.D., recorded that plaintiff has degenerative osteoarthritis at discs C4 through C7 on his spine. (Tr. 205). Also on June 7, 2000, Dr. Meadows continued plaintiff on Vioxx and Skelaxin. (Tr. 209). On June 14, 2000, plaintiff's doctor instructed him to do "modified work (if available)." (Tr. 215). On that same date, physical therapist Mark McMahon completed a progress note on plaintiff for three visits between June 8, and June 14, 2000. Mr. McMahon reported that plaintiff stated that there was no change in his overall

status because he fears pain and will not do more strenuous activity. Mr. McMahon noted that plaintiff "demonstrates smooth, controlled motion and motor recruitment despite complaints of pain." The therapist set a long-term goal of plaintiff being able to return to work in two weeks from the date of the report. The therapist also noted that he wanted to see plaintiff three times a week for two more weeks. (Tr. 182).

On June 16, 2000, plaintiff arrived at his physical therapy appointment three hours late and could not be seen. His appointment was rescheduled for June 19, 2000, but plaintiff failed to show up. On June 20, 2000, plaintiff told a physical therapist that his right shoulder pain was better but that his left lumbar pain continued. Ms. Bennett noted that plaintiff did better on his exercises. (Tr. 187). On June 23, 2000, plaintiff arrived 30 minutes late to his physical therapy appointment and stated that he could not reschedule it. The therapist noted that plaintiff demonstrated improving range of motion. Plaintiff was able to touch his toes. (Tr. 190). Plaintiff was late to his June 26, 2000, physical therapy appointment. He was scheduled to come in at 2:00 p.m., but he called at 2:45 p.m. and asked to reschedule. He was told to come in at 4:30 p.m., but he arrived at 4:00 p.m. (Tr. 191).

On June 28, 2000, physical therapist Katie Probst, MPT, completed a progress note on plaintiff's progress from June 16, 2000 through June 28, 2000. She noted that "[Patient] can do all exercises and move about the gym with no reports of pain, yet when

his measurements are taken he reports significant pain. [Patient] is never on time for PT." (Tr. 193). Ms. Probst wrote that the note could be considered plaintiff's discharge document, or that the physician could ask for plaintiff's continued treatment. (Tr. 193). Also on June 28, Walter J. Griffin, M.D., reported that plaintiff's condition had improved but more slowly than was expected. He reported that plaintiff could do modified work. (Tr. 216). On June 30, 2000, plaintiff failed to show for an appointment. (Tr. 194). On July 12, 2000, Ms. Probst completed a discharge form on plaintiff's treatment. (Tr. 196). The form states that service for plaintiff began May 31, 2000, and ended on June 28, 2000. During this time, plaintiff had 12 visits and he received thermal, electrical, and sound physical agents. He also did aerobic training and range of motion screening. He had manual therapy for soft tissue mobilization and joint mobilization. His lumbar range of motion was full with a small exception. Plaintiff's right shoulder range of motion was only hindered about 90 degrees. Plaintiff achieved functional strengthening, but did not achieve the ability to return to work. Ms. Probst stated that plaintiff was improving until his last visit. (Tr. 196).

On August 30, 2000, Dr. Meadows found that plaintiff's right shoulder was strained. He assigned plaintiff to therapy once a week for two weeks. (Tr. 199). He also noted that plaintiff had been driving trucks to Texas, Kansas City, and Iowa. He wrote that plaintiff put forward "little to no effort" in the range of motion for his arms and for his grip. (Tr. 212). Dr. Meadows also

stated that plaintiff was to return to work on full duty without limitations or restrictions. He noted that plaintiff worked as an over the road driver. (Tr. 217). According to the physician, plaintiff's problem existed in the left trapezius area of his neck and his back. (Tr. 218). In a letter to Tracy Tate, of CGU/Hawkeye, plaintiff's insurer, Dr. Meadows questioned plaintiff's effort on his examination. (Tr. 218). The doctor wrote that he told plaintiff, "if he can drive a semi, he can do his normal activities." He added that plaintiff was still to come for follow-up visits. (Tr. 219).

Plaintiff saw physical therapist Colleen M. Peterson on September 6, 2000. He was diagnosed with a "sprain/strain, shoulder/upper arm" in his right shoulder. Plaintiff complained of tingling, and he rated his pain at a level 8 on a scale of 1 to 10. (Tr. 200). His two problems were functional capability and range of motion. Ms. Peterson stated that plaintiff's treatment would emphasize his range of motion problems. (Tr. 201). Plaintiff had a physical therapy visit with John G. Lorsbach on September 19, 2000. He was an hour and 30 minutes late. Mr. Lorsbach stated that plaintiff exhibited "moderate atypical pain behavior in response to therapeutic activity performed" during his visit. He opined that plaintiff required skilled rehabilitative therapy and a home exercise program. The therapist also stated that the goals for plaintiff were not met, noting that the physician referred plaintiff for only two physical therapy visits. Plaintiff was discharged from physical therapy. (Tr. 204).

On September 25, 2000, plaintiff was seen by Cynthia D. Byler, D.O. (Tr. 220-22). Plaintiff complained that his condition had not improved with therapy. (Tr. 222). Examinations of plaintiff's cervical spine and lumbar spine did not reveal palpable spasms. (Tr. 222). Plaintiff displayed little effort during the manual testing of his GH joints and the testing of his grip strength. (Tr. 222). Dr. Byler discharged plaintiff to the care of Russell Cantrell, M.D. (Tr. 222, 220).

On November 21, 2000, Dr. Cantrell wrote a letter to plaintiff's insurer, CGU/Hawkeye Security Insurance. (Tr. 227). In the letter, Dr. Cantrell wrote that plaintiff was five feet eleven inches tall and weighed 215 pounds. (Tr. 228). He also stated that plaintiff showed several pain behaviors during spontaneous moves during the examination. Dr. Cantrell wrote that plaintiff is able to evenly place weight on both lower extremities, and he can stand on his toes without difficulty. (Tr. 228). Further, Dr. Cantrell wrote that plaintiff presented widespread complaints involving his lower extremity, neck, lumbar spine, and parascapular area. Dr. Cantrell wrote, "I am unable to identify any objective pathology on clinical examination to correlate with these widespread complaints." (Tr. 229). He stated that although plaintiff attributed his complaints to the motor vehicle accident, his complaints of neck pain, left leg weakness and buckling were not expressed in prior medical records. Dr. Cantrell wrote that he did not believe plaintiff would benefit from any further treatment.

He added that he saw no reason that plaintiff could not resume all regular duty activities without limitations. (Tr. 229).

On July 29, 2001, plaintiff was seen at the emergency room at Barnes-Jewish Hospital in St. Louis. (Tr. 235, 241-42). He was then age 41. Plaintiff complained that he had been experiencing back pain, lower abdominal pain, and neck pains for years. He stated that the frequency of the pain had increased. (Tr. 235). His chief complaints were of abdominal pain and pain in the left groin. (Tr. 242). It was noted that plaintiff took Naproxen[5] to relieve his back pain. It was also noted that plaintiff had had Hepatitis C in the past. (Tr. 235). Plaintiff was prescribed Naprosyn,[6] Percocet,[7] and Flexeril.[8] (Tr. 246). Plaintiff had supplied his own transportation to the hospital, and he was able to walk. (Tr. 238). Plaintiff was sent home in stable condition. (Tr. 243).

Plaintiff saw chiropractor Dr. Forbes on August 1, 2001. (Tr. 152). Dr. Forbes stated that plaintiff "should get an Oscar for his performance of being disabled." Dr. Forbes reported that plaintiff left his office without paying. The chiropractor told

---

[5]Naproxen is indicated to reduce pain, inflammation, and stiffness caused by many conditions. <u>See</u> http://www.drugs.com/naproxen.html.

[6]Naprosyn is a generic name for naproxen. <u>See</u> http://www.drugs.com/naproxen.html.

[7]Percocet is indicated to relieve moderate to moderately severe pain. <u>See</u> <u>Phys. Desk Ref.</u> 984 (53d ed 1999).

[8]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. <u>Phys. Desk Ref.</u> 1794 (53d ed 1999).

counselor Tracy Gamayo, who was investigating plaintiff's disability claims, that he "would rather not have anything to do with [plaintiff's] disability." The counselor's report is dated August 23, 2001. (Tr. 152).

On August 17, 2001, plaintiff had an initial consultation with L. Michael Brunt, M.D. (Tr. 251). He was referred to Dr. Brunt during his emergency room visit at Barnes-Jewish Hospital. (Tr. 251). The doctor noted that plaintiff had pain radiating down toward his groin. The pain woke him up at night, and he has experienced constipation and hard stools. The report from the visit shows that plaintiff has a tobacco habit of one pack per week. Plaintiff's physical exam revealed that he is a "[w]ell-developed, well-nourished male." He measured five feet eleven inches tall and weighed 233 pounds. It was noted that plaintiff was touchy to examination, but the doctor did not sense any palpable abnormalities or any hernias. Dr. Brunt ordered an abdominal and pelvic CT scan. (Tr. 252). On August 31, 2001, Dr. Brunt noted that he spoke with plaintiff regarding the CT findings. The findings show that there was some slight thickening in plaintiff's sigmoid, and plaintiff may have had a diverticulitis episode in the past. Dr. Brunt noted that plaintiff was taking an anti-inflammatory medication, and suggested that plaintiff stay on a high fiber diet and try Metamucil.[9] Dr. Brunt stated that he

---

[9]Metamucil is indicated in the management of chronic constipation, irritable bowel syndrome, as adjunctive therpay in the constipation of diverticular disease, the bowel management of patients with hemorrhoids, for constipation associated with

would send plaintiff to a gastrointestinal specialist if he continued to have symptoms. (Tr. 254).

In his decision, the ALJ notes that plaintiff saw psychiatrist Suresh Chand, M.D., on March 22, 2002. (Tr. 20). Plaintiff reported that he was experiencing depression, fatigue, and other physical ailments. His next reported visit to Dr. Chand was in September 2002. On that date he told Dr. Chand that "he wanted disability." The ALJ stated that Dr. Chand made plans to start cognitive psychotherapy, but plaintiff did not return for another visit. (Tr. 20). In the clinic notes of November 2002, Dr. Arbaugh wrote that plaintiff reported visiting Dr. Chand on a couple of occasions two years earlier. He also stated that plaintiff had not seen Dr. Chand recently. (Tr. 269).

On November 8, 2002, Dr. Arbaugh completed a clinic note on plaintiff. (Tr. 269). The note states that "[i]nformation was obtained from the patient who appeared to be reliable." (Tr. 269). The note mostly discusses plaintiff's psychiatric history. It states that plaintiff has felt depressed for the past few years. His depressive symptoms include a 20-pound weight loss over a year, interval insomnia, poor concentration, frustration, and feelings of hopelessness and worthlessness. He also has had suicidal thoughts, but he denied current intent to commit suicide. He attempted suicide in the 1980s. The doctor also reported that plaintiff has some auditory hallucinations that instruct him on how to get money.

---

convalescence and senility and for occasional constipation during pregnancy. Phys. Desk Ref. 2528 (53d ed. 1999).

He has paranoid ideation and feels watched. Dr. Arbaugh also noted plaintiff's history of alcohol and drug abuse. He wrote that plaintiff indicated that he drinks six beers and a fifth of hard liquor on weekends. (Tr. 269). Further, plaintiff has abused marijuana, cocaine, amphetamines, barbiturates, and LSD. Plaintiff told Dr. Arbaugh that he had not used any of those drugs in the past ten years. Dr. Arbaugh's mental status examination of plaintiff showed that plaintiff appeared depressed. Plaintiff's insight and judgment were fair. (Tr. 270). Dr. Arbaugh gave the following diagnoses of plaintiff: (1) "Major depressive disorder, single episode with psychotic features. Alcohol dependence. Poly substance abuse;" (2) back pain and Hepatitis C; and (3) Marital, occupational, and economic problems. (Tr. 270-71). Dr. Arbaugh instructed plaintiff not to use alcohol or any illicit drugs. He suggested that plaintiff be referred to a treatment program if he was unable to maintain his sobriety. Dr. Arbaugh also prescribed Effexor XR[10] 75 mg. and Geodon[11] 40 mg. (Tr. 271).

On November 12, 2002, T.Z. Chen, M.D., completed a pain management center progress report on plaintiff. (Tr. 262-63). It was noted that plaintiff had pain in his lower back and down his left leg. He rated the pain 8 ½ on a 10-point scale. It was noted

---

[10]Effexor is indicated to treat depression. See Phys. Desk Ref. 3294 (53d ed. 1999).

[11]Geodon is ziprasidone hydrochloride. It is an antipsychotic medicine indicated for the treatment of schizophrenia, bipolar mania, and acute agitation in schizophrenic patients. See http://www.geodon.com; http://www.pfizer.com/download/uspi_geodon.pdf.

that plaintiff had been on anti-depression medication in the past. (Tr. 262). It was also noted that he had an alcohol and drug addiction (Tr. 262-63). Plaintiff was diagnosed with lumbar radiculopathy. (Tr. 263). Consultation was the only procedure that took place during plaintiff's visit. (Tr. 264). He was prescribed 600 mg of ibuprofen. (Tr. 265).

Dr. Chen conducted an MRI of plaintiff's lumbar spine on November 19, 2002. (Tr. 266). He employed a spin echo technique. Three impressions resulted from the MRI: (1) "Small central disc herniation . . . associated with a tear in the posterior annulus;" (2) "Significant epidural lipomatosis in the lower lumbar and sacral spine;" (3) "Probable persistent red marrow." The test revealed that plaintiff has normal vertebral body alignment and his body heights and disc spaces are well preserved. (Tr. 266).

On July 28, 2003, Dr. James T. Hurley, a licensed psychologist, conducted a psychological evaluation of plaintiff. (Ex. C). The evaluation procedures were: (1) clinical interview and mental status, (2) review of medical records, (3) Beck Depression Inventory. Plaintiff indicated to Dr. Hurley that he was applying for Social Security disability benefits. Dr. Hurley stated that plaintiff's mood is depressed and despondent and his affect is restricted. He added that there is no evidence that plaintiff has any formal thought disorder. Dr. Hurley also stated that plaintiff has difficulty timely completing tasks because he shows a "marked restriction of his activities of daily living, marked difficulties in social functioning and deficiencies of

-19-

concentration, persistence and pace." The psychologist wrote that plaintiff noted that he lacks medical coverage and money to obtain treatment or medication prescribed to him by Dr. Arbaugh. Plaintiff told Dr. Hurley that he takes over the counter medication. Plaintiff scored 36 on the Beck Depression Inventory, which is indicative of severe depression. The psychologist also stated that plaintiff "has significant symptomology and no source of treatment to help reduce this." Dr. Hurley made the following psychiatric classification: (1) Major depressive disorder, recurrent alcohol dependence with psychotic features but in remission, and a history of polysubstance abuse in remission; (2) back problems and chronic pain; (3) occupational, marital, and financial problems; (4) Global Assessment Functioning of 50, with his highest GAF being 55 in the previous year. Dr. Hurley recommended that plaintiff seek psychiatric treatment as soon as possible. He stated that plaintiff's depression has become extremely serious and affects all areas of his life because it is untreated. (Exh. C).

## IV. The ALJ's Decision

The ALJ made the following findings:

1.  The claimant met the special earnings requirements of the Act as of November 14, 2000, the alleged onset of disability, and continues to meet them throughout the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since November 14, 2000, although he had a number of short-term or temporary jobs after that, including one as recently as November 19, 2003.

3.   The medical evidence establishes that the claimant has inactive hepatitis C, a small disc herniation at L5-S1 without nerve root compression or impingement, and a possible mild (and not very credible) depressive disorder, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.   The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible, for the reasons set out in the body of this decision and in a prior decision dated December 27, 2002.

5.   The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally.   There are no credible, medically-established mental or other nonexertional limitations (20 CFR 404.1545 and 416.945).

6.   The claimant's past relevant work as a janitor/cleaner and truck driver did not require the performance of work-related activities precluded by the limitations described in Finding No. 5 (20 CFR 404.1565 and 416.965).

7.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 415.920(f)).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).   The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).   An

individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A(), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140–42 (1987).

-22-

**A.   Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).   "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).   The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

    1.   The ALJ's credibility findings;

    2.   the plaintiff's vocational factors;

    3.   the medical evidence;

    4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

    5.   third-party corroboration of the plaintiff's impairments; and

    6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

## B. Plaintiff's Allegation of Error

Plaintiff's administrative appeal raises the issue of whether the ALJ erred in finding that plaintiff did not suffer from a disabling mental impairment. Plaintiff argues that his disabling mental impairment was supported by the opinions of Dr. Arbaugh, plaintiff's physician, and Dr. Hurley, a consulting psychologist. He argues that the ALJ did not contradict the doctors' opinions with medical evidence. Defendant argues that the ALJ properly considered all record evidence in determining the credibility of plaintiff's mental disability allegations.

Plaintiff argues that Eighth Circuit law requires that the ALJ's decision be supported by some medical evidence. Plaintiff quotes Krogmeier v. Barnhart, 294 F.3d 1019, 1023-24 (8th Cir. 2002), for the proposition that the ALJ must obtain medical evidence to support the determination of plaintiff's residual functional capacity (RFC) and ability to function in the workplace. He argues that the ALJ acknowledged his visits with Dr. Hurley and Dr. Arbaugh but did not cite any medical evidence in contradiction to their findings. He also argues that the ALJ relied on his

"self-derived medical opinion" instead of relying on medical evidence.

In his brief, plaintiff relies on <u>Lauer v. Apfel</u>, 245 F.3d 700 (8th Cir. 2001), to support his argument that the ALJ's decision was flawed. He uses the case to illustrate his argument that the ALJ needed medical evidence to support the RFC he determined for plaintiff. The <u>Lauer</u> court found that there was not substantial evidence to support the ALJ's assessment of the degree to which plaintiff's RFC was affected by plaintiff's mental impairments. The Eighth Circuit was unable to find any medical evidence in the record to support the ALJ's conclusion that the claimant's mental impairments were limited only to public interaction. <u>Id</u>. at 704. The Court stated, "[A]lthough in evaluating Mr. Lauer's RFC, the ALJ was not limited to considering medical evidence, we believe that the ALJ was required to consider at least some supporting evidence from a professional." <u>Id</u>. The Eighth Circuit vacated the district court's opinion affirming the ALJ's decision and ordered the district court to remand the case to the Social Security Administration. <u>Id</u>. at 706.

Defendant argues that the ALJ properly considered the opinions of Dr. Arbaugh and Dr. Hurley as opinions of examining physicians and not as treating physicians. She argues that the opinions of Dr. Arbaugh and Dr. Hurley "do not represent the unique longitudinal perspective for which a treating physician is accorded greater weight." Defendant also argues that Dr. Arbaugh and Dr. Hurley based their opinions in part on plaintiff's report of his

psychiatric history and his subjective reports of pain. She argues that plaintiff's complaints about his physical impairments were not credible and his report of his history were inconsistent with his other statements. Defendant relies on <u>Sultan v. Barnhart</u>, 368 F.3d 857, 863 (8th Cir. 2004), to support this argument. Defendant further argues that "Dr. Hurley's conclusion that plaintiff was unable to maintain competitive employment is not a medical opinion, but is an opinion on the application of the Social Security Act."

"A claimant's RFC is what he or she can do despite his or her limitations." <u>Persall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001)(citations omitted). The Eighth Circuit added that "[i]t is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." <u>Id</u>. The ALJ must first determine the claimant's credibility. <u>Id</u>. at 1218. "In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." <u>Id</u>. (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984)).

First, this Court looks at whether there is substantial evidence to support the ALJ's credibility and RFC determinations. The ALJ found plaintiff's allegations of a severe mental impairment not credible. The ALJ noted that plaintiff visited one

-26-

psychiatrist and said that he "want[ed] disability." (Tr. 20). The ALJ also noted that no evidence in the record showed that plaintiff could not afford mental health services, as he suggested. Because plaintiff was able to obtain the medicine needed for his back pain, the ALJ stated that there was little reason to believe that plaintiff could not obtain the medication needed for his mental impairments. (Tr. 21). The ALJ found plaintiff's allegations of auditory hallucinations not credible because no evidence on the record showed that plaintiff experienced psychotic episodes during job performance. (Tr. 21). He found that plaintiff has the RFC "to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally." (Tr. 22).

Substantial evidence supports the ALJ's finding of plaintiff's credibility and RFC. Although the <u>Polaski</u> factors are not specifically stated in the ALJ's decision, they are addressed. First, the ALJ found that plaintiff's work activity is inconsistent with his allegation of disability, even though it did not qualify as substantial gainful activity. He noted that plaintiff "has never had any disinclination to look for jobs, and no failure to secure jobs, often at very significant levels of exertion, since his alleged onset date of disability of November 14, 2000." (Tr. 20). Next, the ALJ found that plaintiff has not had any surgeries or hospitalizations in recent years. He also found that any side effects from medications were eliminated or diminished by changes

in either the medication, or the size and frequency of the dosages. Further, the ALJ found "no documented evidence of nonexertional pain seriously interfering with or diminishing the claimant's ability to concentrate." (Tr. 20). The ALJ did not discuss any precipitating or aggravating factors. However, he did address possible restrictions due to plaintiff's alleged mental impairment. He noted, "If the claimant is genuinely mentally ill, his actions (continuing to work and not seeking sustained treatment) belie any conclusion that the illness is of an especially severe degree, or of any significantly limiting degree at all." (Tr. 21).

Next, the Court will address the weight given to the opinions of Dr. Arbaugh and Dr. Hurley in the ALJ's decision. "[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878 (8th Cir. 2002) (quoting 20 C.F.R. § 404.1527(d)(2)). The Eighth Circuit has further stated that "an ALJ should 'give good reasons' for discounting a treating physician's opinion." <u>Id</u>. at 878-79 (citations omitted). Despite the fact that treating physician's opinions are accorded special weight, the opinions do not automatically control because the record has to be evaluated as a whole. <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995).

The Court's examination of the record shows that there is substantial evidence to support the weight the ALJ gave to the opinions of Dr. Arbaugh and Dr. Hurley. Significantly, the ALJ

found that, with the exception of the opinions of Dr. Arbaugh and Dr. Hurley, "every other piece of evidence in this record contradicts a finding that the claimant really has a severe chronic depression." (Tr. 21). Each of the doctors' opinions were based on one visit with the plaintiff. In each visit, plaintiff related his assessments of his condition to the doctors. According to their own notes, much of the information in the reports of Dr. Arbaugh and Dr. Hurley come from plaintiff's subjective complaints. Dr. Arbaugh even stated that "[i]nformation was obtained from the patient who appeared to be reliable." (Tr. 269). However, the notes of most all of plaintiff's other medical caregivers leave the impression that plaintiff was not reliable. Plaintiff's doctors and physical therapists noted that plaintiff's complaints of pain and low functionality did not match his examination results. They repeatedly note that plaintiff showed "little to no effort" in physical therapy. Plaintiff's chiropractor even stated that plaintiff deserved an Oscar for his disability act. Throughout the transcript, physical therapists and doctors note plaintiff's late arrival to many appointments and his complete absence at others. Several doctors also stated that plaintiff could return to work with little to no limitations. Unlike the Lauer case, the ALJ did consider evidence by professionals that supports his RFC determination. This is illustrated above. The Court finds that there is substantial evidence to support the ALJ's decision.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#20] is **denied.**

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of July, 2005.